Arguments not to exceed 15 minutes per side. Ms. Knoll for the appellant. Ms. Knoll, could I ask you, just as a preliminary matter, is the person sitting at table with you an associate or is it your client? It is my client, Judge Autry. Her name is Caitlin Sjostrand. Well, the only little piece of etiquette is that we don't normally allow clients to sit at counsel table. You may not have known that, but it's part of our practice not to allow that. I apologize, Your Honor. I can have her sit in the galley. I think that would be preferable. Thank you. I apologize. That's okay. No, that's all right. Good afternoon. I didn't know that either. Okay, good. I'm in the majority, finally. I'm not trying to undercut Judge Autry because she knows what she's talking about. Yeah, I've been here a while. Well, good afternoon. As you know, my name is Laird Knoll, and as you know, my client, Caitlin Sjostrand, is with me this afternoon. We're here on appeal from a grant of summary judgment, and two of the things that I'd like to discuss today with the court are the standard with the components of the absolute deference that's given, and pretext with the component of honest belief. Now, the standard that the trial court used was the Stolle standard, and that is incorrect. Now, at this time, there's no, I guess, published case that tells us that Title II cases are subject to the Humboldt decision. So when you say that that Stolle standard is incorrect, are you relying on Lewis v. Humboldt, or are you relying on the Supreme Court case, I guess that was, that talked about the, you can't apply that lesser standard. I'm forgetting the name, but what's your authority for the statement that you just made? Well, I'm relying on the Lewis v. Humboldt, and I'm looking at Judge Stranch's opinion where she offers that only the pre-2008 statute is before this court, number one, but Humboldt was the employment issue, and here we have an educational institution issue. And also, Your Honor, I look to your opinion in Lewis v. Humboldt, where you state that the courts have actually defined a motivating factor in but four to be the same. And honestly, if you take it as flattery, I mean it, but it's not for my opinion here. Common sense dictates that if it's not Stolle, there's more than one reason going on at this time, and it is not supposed to be Stolle, but also even in the majority opinion in Humboldt, the majority talks about taking from the but four standard and it not being Stolle. Now, there's also the Perry v. Cincinnati, but at last week, Judge Marbley in the Southern District decided Johnson, Kerry Johnson v. the Washington County Career Center, and in that case, he specifically says there's a rehabilitation claim in that case, and there's also an ADA claim. It was an educational institution as well, and a failure to accommodate case. And in that case, Judge Marbley says that the Stolle standard is incorrect for the ADA claim. Well, I mean, didn't we hold that in Humboldt? I mean, Humboldt was what, a Title VII? Yes. And Title, I mean, that doesn't by its terms, I guess, apply to the ADA. Well, Humboldt was the... Or does it? I mean, I thought, my understanding was that it was pretty much established walking in the courtroom today that the motivating factor applies to your ADA claim, but that solely probably applies to the Rehabilitation Act, because that's what the statute says. That is, and to correct myself, the Lewis case was an ADA case, but... It was an ADA case. Yes. Okay, good. And I apologize. I'm up for two right now. That's how you're doing. But yes, we believe that, I mean, yes, we are not disagreeing that the Stolle standard is the standard for the Rehabilitation Act. But you argue you've created a genuine issue even as to that standard. Absolutely, absolutely. And that is actually what brings us into the burden of proof in this case is really high. I mean, yes, I understand as OSU put, the appellee put in their brief at page 47, that we have a, the burden of proof remains on the plaintiff, but they say, and this is the course that the trial court took in its opinion, the burden is much heavier throughout this burden-shifting process, the ultimate burden of persuading the trier of fact that the appellee intentionally discriminated against Ms. Sostrand remains at all times against, with Ms. Sostrand. But the key in here is that it's the trier of fact, and the trial court is not the trier of fact. The trier of fact is the jury in this case. And what the trial court did was assess all of the facts, and one by one the court said, that's no evidence, no evidence, no evidence. And that's, appellee is going to say and has said, well, you know, it doesn't matter because they don't meet either standard because the trial court said there's no evidence. But that's not true. That's not true.  And this pretext argument, these set of facts are on par with the Osmo case, Osmo v. Keene, which we cited in our brief. And the pretext does not start with that first letter that Ms. Sostrand gets and says, hey, you're not, or the first letter that she gets from Ms. Pastore. It starts with her conversation. It starts with the first reject letter, as we're going to call it. She called Dr. Joseph and said, after she made it up the chain, she called Dr. Joseph and said, I'm Caitlin Sostrand, I'm calling regarding my denial and I want to talk to you about it. She left two messages. It took two weeks to get back, so it wasn't like pick up the phone, hey, I don't know who you are. A reasonable jury can conclude that she had enough time, she knew exactly who Caitlin was, and then the fumbling through the conversation that she had with Caitlin, it is just not credible. She speaks to Graham first, isn't that right? Hosa and then Graham. I thought she spoke to Graham, or she speaks to somebody who says, you know, I don't really know anything about it, let me get the file. The file says not a fit or something. That was Graham. Okay, and is that, was that the first phone call she made? After she gets the rejection letter? And I apologize, Your Honor, but I thought she spoke with Ms. Hosa first, because Ms. Hosa was the one whose name was on the letter, the reject letter, and then Ms. Hosa referred her to Mr. Graham, and then Mr. Graham referred her to Dr. Joseph, who is the director of the program. She speaks to Joseph on April 7, 2010, and supposedly gets a vague explanation. Yes, and I want to point out here, this wasn't Ms. Sostrand saying, oh, you know, this is my disability, I'm going with her pitchfork and her torch. This was Ms. Sostrand calling and saying, you know, I've got to figure out what I'm going to do better. I've got to figure out how I can do what I need to change so that I can get into this program, this is what I want to do. And so she called and she asked questions, her questions were, can I take classes and be an intern, and if I take as an intern, can I apply those if I can get in later, and what is needed to be a good fit here, and how will I get accepted if you've denied me now, and can I appeal this decision? It's not, you know, you discriminated against me based on my disability. So then Ms. Sostrand asked Dr. Joseph this, who can't respond. And she hasn't, and she blames the fact she doesn't have the file on her at the time of the conversation, but she had ample opportunity to get it beforehand. And Caitlin left a message, this is what I'm calling about, this is what my name is, she was the only person they interviewed that wasn't admitted. So then we go into the email from Ms. Sostrand to Dr. Pastore, that I can't get a reasonable answer, and she's trying to make sense of this, and I can't get a reasonable answer here, given the fact that my interviews had something to do with, had a lot to do with my disability, and they didn't sit right with me at the time, but okay, now I've got these vague answers, and nobody can explain it to me, I'm going to, one and one here makes two. Now I understand that if Kelly's going to get up and say, well, that's Ms. Sostrand's one and one, and make two, but the other things that continue to call Dr. Joseph in particular into question, and her credibility into question, things that I ask, why can't, why did you check not a good fit, why didn't you put, it said could not... Not accommodate a research area. Yeah, because that was the big beef. Why, if we say that their concern about interest in counseling versus interest in whatever they focus on, was the real issue for them. If we take them at their word, why doesn't that, why isn't that consistent with does not fit the program, rather than can't accommodate some research interest. Well, number one, you're giving them absolute deference at that point, and that's not the only reason that was given. Well, I'm just trying to understand what does not fit means versus not accommodate. What's your understanding of those categories? Well, does not fit, I don't know that we know what does not fit means at this point. They're alleging it's that, but if it doesn't fit a research interest, why doesn't she put it and doesn't fit a research interest? When I asked Dr. Joseph about that, she said she didn't know how to fill it out. She's the director of the program for how many years, and every time there's a research person under, may I finish my thought, Jerome? Sure. Any time there's a person that comes in that's going to be under their research, or if there's a denial, then Dr. Joseph is going to sign this, and she's feigning ignorance. All right, very good. You'll have your rebuttal, and we'll hear from your opposing counsel here, Ms. Yannico. Good afternoon, Your Honors. Good afternoon. I think you can adjust the height if you like. Thank you. Is this the wrong way? Much better. Thank you. Sure. Mia Yannico for the Appellee of The Ohio State University. Ms. Shostrand was denied admission to OSU's School Psychology Program because the faculty reasonably determined, based on what she actually wrote in her written responses to the applicant questions, and what she actually said during the in-person interviews. What in particular during the in-person interview are you referring to? Sure, thank you. During the interview, she indicated that she wanted a non-school psychology faculty member as her desired mentor. Here's why that mattered. The School Psychology Program at OSU is very small. There are only three faculty members. For PhD students in particular, they're going to be writing a dissertation, so they're going to be working very closely with their faculty advisor in conducting research and writing their dissertation. Ms. Shostrand indicated that she wanted Dr. Darcy Grinello as her mentor. Dr. Grinello is a faculty member in the counseling program. When Ms. Shostrand explained why it was she wanted Dr. Grinello as her mentor, she indicated that her experiences and her areas of research were very interesting to her. That was significant to the School Psychology faculty members because Dr. Grinello's research focuses on adults, and specifically those adults with mental health concerns. Did anyone in the interview make that point to Ms. Shostrand? No, neither Dr. Joseph nor Dr. Radliff. It's kind of an odd omission, isn't it, to not react or ask her to explain or raise that concern and yet thereafter say that's why you were the only person among the interviewees who was denied admission, isn't it? Well, it could be said, Your Honor, that that is odd that they didn't do that. They were certainly not legally obligated to give her a do-over of the responses that she had made to the written applicant questions. Dr. Radliff testified during her deposition that the day begins with an overview of the School Psychology program. You meet the three faculty, after which there's these two group exercises and then the individual interviews. Dr. Radliff said, you know, we're curious. You've been here. You've seen us. You know it's the three of us. Curious to see if you'll correct that and say, acknowledge, oh, I might have said this, but really I want one of you three. The other issue that showed that Ms. Shostrand was not a fit was that she expressed an interest in counseling. Parents of disabled children, right? That is the statement that she made in response to question number 11 is that she wanted to provide counseling to parents of disabled children. It's not that she said, you know what, my primary interest is in counseling adults with their problems or their own disabilities. I mean, she said she wants to counsel the parents of children who have disabilities. And so why couldn't a jury, a reasonable jury, say, you know, that seems like it's an interest that's incidental to counseling the kids. And so that doesn't seem like a real persuasive or credible reason to deny her admission. Why couldn't a jury think that way? Well, Your Honor, it's the three faculty members in the school psychology program who truly are in the best position to determine what makes someone a fit for their program and whether somebody is a fit. But the law still applies to those three people. That is correct, Your Honor. We don't just wave it through. But there's no genuine dispute of material fact here, nor, and that's what the district court magistrate, Judge Abel, he did weigh the facts, and he did look at the facts, and at his conclusion, he determined that there was no genuine dispute to any material fact. Furthermore, he said that Ms. Shostrand was not able to establish that the faculty's legitimate nondiscriminatory reason for why they denied her admission, that she simply was not a fit, was pretextual. At the summary judgment stage, though, is it the province of the judge to weigh the evidence or to simply see if the evidence as put forth creates that issue? In fact, isn't the weighing, as your adversaries say, isn't that weighing within the province of the jury, the trial fact? Well, the role of the judge was to determine whether there was any genuine dispute, and in doing that, he reviewed the record. He reviewed the evidence that was provided to him. And he needs to, of course, as you say, under the summary judgment standard, take the evidence in the light most favorable to the nonmoving party. Okay, I'm sorry. Please. No, go ahead. No, I've talked enough. Go ahead. So have I, but, well, so you used the term review this time, but you used the term weigh, and I think in the law, those have two different meanings. I may have misspoken, Your Honor, and if I did, I do apologize for that. But the fact remains that the faculty determined that she wasn't a fit, and there is case law that says that that opinion, their decision not to admit her to the program that was made. I'll ask you the question that was asked your adversary. What does that she wasn't a fit mean? Wasn't a fit for? She wasn't a fit for the school psychology program, and that was based on the fact that she said she wanted a non-school psychology faculty member as her mentor and that there were things that she said during the course of the interview that made the faculty members in the school psychology program believe that she would be better suited to counseling. And when they said does not fit, that might sound like a sort of vague, amorphous answer, but that truly was the answer. She truly didn't fit their program. I'll go back to what Judge Ketlet said earlier. In this interview process, if one is confronted with the belief based on objective facts that this person is not a good fit for our program because of these answers, might someone adjust, confronted with the reality, isn't there a possibility to adjust, and maybe that person might be seen differently or they could make different decisions. So I guess I'm troubled by the fact that this was never communicated to her and she was never given that opportunity to adjust. Well, again, Your Honor, there was no obligation that the faculty members... But a jury is not obligated to believe everything a witness says either. And so the question before us is whether, as a matter of law, the jury has to believe what Lorese Joseph said as opposed to what Ms. Sjostrand is saying. And I want to be candid with you. It seems like there are reasons that the jury could disbelieve some of the reasons that are offered. I mean, you know, this email with the five points, which query whether a jury could see this as papering the file, but setting that aside, couldn't a jury think that these are not true reasons and that actually this is a post hoc pretext when none of these things, or most of them, weren't even asked about? You know, I suppose it is possible that a jury could find that, but it doesn't change the fact that those were legitimately the faculty's reasons. When Ms. Sjostrand spoke to Dr. Joseph on the telephone, Ms. Sjostrand testified that the first thing Dr. Joseph said to her was, I don't have your file in front of me, so I'm not able to give you the reason, the concrete reason for why you were denied. So from there she... It was two weeks after she left the first voicemail, right? And they're still... That is correct. ...stretching their heads over there about why they denied admission. And if you concede that a jury could believe the statement that Judge Kepler has made, aren't you conceding the existence of a material issue of fact? We do not concede that there are genuine issues of material fact in a case, in this particular case. All that Ms. Sjostrand has shown here is that she does have Crohn's disease and that she was denied admission, but she hasn't shown that there was anything that linked the two of those things, nor can she show that OSU's legitimate reason, she simply was not a fit for the school psychology program. You're asking for direct evidence. She doesn't have to come up with that, and frankly, almost nobody can. That is correct, Your Honor, and we agree that she was not required to come up with direct evidence, but she still has to come up with something. Okay. Something that raises... I mean, she gets rejected for reasons they never ask her about. Professor Miranda says if these, in fact, were her concerns, she totally would have asked about them. Apparently they spend much more time talking about Crohn's disease than any of these things that are the putative basis for her rejection. Isn't that some evidence? They asked her one, each professor asked her one and only one question that related to her Crohn's disease, and the evidence establishes that that question was asked in response, a response that she had provided to the applicant questions where she self-disclosed that she had Crohn's disease. The ADA enforcement guidelines that we cited at page 39 of our brief tells us that that question, question 10, how an applicant responds to stress in novel situations, is a legally permissible question. Not only that, that once Ms. Sjostrand self-disclosed that she had Crohn's disease, that it was permissible for the faculty members to ask her about that. And the evidence also shows that after she responded to each of their questions, Dr. Joseph didn't say or ask her anything else in addition, and Dr. Radliff simply nodded in affirmation, which is consistent with what Dr. Miranda testified, that she felt that she could handle stress, and after she provided that response, the faculty, it wasn't an issue for them. Her Crohn's disease, whether she could respond to it wasn't an issue. So there was no error in the faculty members asking her about Crohn's disease during the course of the interviews. Well, I mean, I guess I'm still left asking why no reasonable juror could connect these dots to say they, in fact, rejected her because of the Crohn's disease, and they papered the file after, and send out this studiedly vague letter, and that, in fact, is what happened. I mean, why couldn't a reasonable jury not reach that conclusion? Well, the general rejection letter that an applicant receives, so the March 17th letter that Ms. Sjostrand did receive, that's generated by a computer after the information from that graduate admissions decision form is inputted into the system. And it's short. It's very basic. If you get accepted, you're accepted. If you're denied, it says that you're denied. And then the letter that ultimately was received by Ms. Sjostrand from Dr. Pastore after she followed up and asked for an explanation of why it is that she was denied was shortened after consult with various offices on campus, including the Legal Affairs Office. But what that letter said, importantly, was that the reason she was denied is because the faculty determined that she was more suited toward counseling than she was school psychology. That is really true. That is really what the faculty believed. Well, I mean, but as a matter of law, you're saying no jury could disagree with what you just said? I mean, that has to be the case. I mean, if a juror could reasonably disagree with what you just said, then this case goes back, and the jury can decide whether they believe Professor Joseph, right? It's not good enough that you just yourself think that. Well, you know, we would argue, and again, the district court did fine. There were no genuine disputes. That's what we're here to review. I understand that, Your Honor, and that is correct. But we would argue that there isn't a question here and that the facts are what they are, and you can't link the fact that the faculty member said that she was not a fit for the program to the reason was because she has Crohn's disease, that whatever is in the record as it is presented here doesn't establish that those two things go together, that the reason she was denied was based on that. And it's important to note that the district court did not actually apply the Soli standard from the Rehabilitation Act to Ms. Shostrand's ADA claims. If you look at pages 15 and 17 of the court's opinion, which are cited in our brief at page 33, the court actually said in a few excerpts that Ms. Shostrand was unable to show through the evidence that she proffered that the reason was because of her having Crohn's disease. Yes, it is true that the court, when they recited the standard, correctly recited the ADA, correctly recited the Rehabilitation Act, and then set forth a three-part prima facie case that included the Soli standard, but there's no evidence through the rest of the court's opinion that they actually then applied Soli to the ADA claims. Graduate school admissions are highly competitive. The faculty look to admit those students who really are going to be the best fit for their program, and OSU determined that Ms. Shostrand was not a fit for its program, but instead was more suited to counseling. That decision was unrelated to her having Crohn's disease. She's offered no evidence from which this court could reasonably infer that that admissions decision was based on her having Crohn's disease, so this court need not second-guess that decision and should affirm the district court's grant of summary judgment to OSU. Thank you. Thank you. Your rebuttal.  I gather that Judge Kethledge is concerned that there's a possibility that your client's case got, I think he used the word, papered over. But I'm looking at page 20 of the district court opinion where the district court laid out those five factors that were given by the school to substantiate their conclusion that she didn't fit their program. And it looks like all of those came from answers that she gave in that original questionnaire where she answered their questions and said such things as, I have limited experience with children. I think she said she had done some tutoring, but it looked like she tutored her own, the students that were in a class with her. She admitted that she had no research to back her up because she had gone through undergraduate school in two and a half years, which doesn't give you time to do any research. And they had people there who not only had extensive connection with children, but did have research on their resumes. So I'm just wondering why that doesn't stand up. She did express interest in counseling with adults. And the reaction of the school was, we don't have any courses that would satisfy your desire to do that. We don't know about that. And, of course, there was the thing about who she picked out from the faculty. And let's see. Oh, the thing about the mission of OSU's program, as I understand it, they are concerned with a psychology counselor dealing with children in inner city areas. And there's nothing that apparently was apparent in your client's background that would have pointed to that. So it's just a long series of problems that they had. I agree, Your Honor. And there's several things that will answer those several questions. And it goes back to partially to the interviews. Now, there was no discussion during the interviews of Dr. Granello. They could have asked, no, they're not obligated to, but why didn't they? They get in there and they ask. They say, well, how do you handle stress with, how are you going to handle grad school with this, the stress of grad school with this bruise disease? I'm really wondering. I just have to say this because it struck me so strongly while I was preparing for this argument. She came through undergraduate school in two and a half years with flying colors, with a high grade point average, good GRE average. Why would anybody think that she was disabled? Why would anybody think that she couldn't get through graduate school when she'd done such a bang up job while she was in undergraduate school? So I'm not sure that the questions that they did ask about her Crohn's disease weren't just sort of courtesy questions because it said in there that she knew how to deal with stress and she didn't think she'd have any trouble. Well, Your Honor, I say we have to look at the totality of the circumstances at this point because the questions they did ask were black and white. How does she deal with stress? Well, she deals with stress by getting through college in 2.5 years with a 3.857. Exactly. But then they don't ask her the question of why did you pick Dr. Granello? So they essentially set her up. They say, well, we didn't want to embarrass her or we didn't want to feed her the answers to the questions, but they go in and focus on something that they have a very big answer to already. The reason they said they brought her in in the first place was to bring her in, was to question her on some of this. It's kind of like the Johnson v. Washington County Career Center. They brought her back. There was a 2008 case. They brought her back in 2009. They said, well, we did it so we can show we won't discriminate, but then they set her out and booted her again. Well, I think it's my guess that if they had asked her why she wanted to work under Dr. Granello, something like that, she would have given them exactly the answer that she gave when she answered the questionnaire. And then if somebody had said, yes, but she's not in our program. She's in the school counseling program. Why would you want her? You know, I'm speculating. I'll admit it. But I think your client would have said, oh, well, if that's not appropriate, then I would be glad to work under one of the people in your program. I mean, what were they going to discover by asking her about that? You talk about black and white. It was down on a piece of paper in black and white. And, Your Honor, I don't mean to argue with you here. I respectfully disagree. They brought her in to ask her that question, and then they didn't ask her. Okay, well, that's your view of it. I understand. And we have to view this in the totality of the circumstance. We can't nitpick it when we're dealing with circumstantial evidence, or else plaintiffs will never be able to prove anything. It places just an onerous burden on them. I understand that. I understand your argument. But my point is that anybody that can get through undergraduate school in two and a half years with the record she got through has demonstrated that the Crohn's disease is no problem for her. And I don't think those people could have missed that. It strikes me that it was the first thing that I saw looking at the briefs, and I just don't think those people that were interviewing her could have missed that. And that's the whole case. Did they turn her down because she had Crohn's disease? If I may just respond to that. Certainly. It's really not just about that. I mean, Ms. Schinella has already told us how competitive the education system is becoming. And any time, it doesn't matter whether you're pregnant, you need FMLA, you have a disability, you're going to need a little extra effort from somebody. And that's what was going to happen here. She was going to need a little extra effort at some point when she would go take her medication. And it's not even that maybe she did need it. It's the fact that the jury could likely find, well, she might need it. And that's going to be on us. And that's a pain. We've got all these other students. That's what the problem is. It's not just that they knew. I mean, she's overqualified. That's why I'm here today, because she is qualified for this program. The fact that I'm here today is because these people saw that there was going to be some extra effort down the road, potentially, and they didn't want to have anything to do with it. Okay. Any more questions, Judge Autry? No, thank you. Okay, Judge Donald. All right, thank you both for your arguments. The case will be submitted.